Here from Mr. Hoppe. Hoppe, I'm sorry. May it please the court. When Lieutenant Carroll, who was holding a shotgun at the low ready, approached Tremayne Bugg and said, stop, we need to ask you some questions, a reasonable person would not have felt free to disregard that request or to leave. Now in response, Mr. Bugg did not flee. He did not turn his back and walk away. He yielded to this show of authority. But at the time of this seizure, the information available to the officers of individualized, reasonable suspicion that Mr. Bugg was engaged in In evaluating whether a Terry stop is is valid, it's necessary to determine when and whether a person was seized. And then secondly, what did the officers know at the time of the seizure? What was their reasonable suspicion? In this case, the district court found that Mr. Bugg was seized when Lieutenant Carroll told him to stop and answer some questions. Now some of the other circumstances or events that were taking place or had taken place at that point amplify why this was a seizure. As I said earlier, Lieutenant Carroll, who was part of the fugitive task force, was carrying a shotgun at the low ready. Now a shotgun in carrying that so that it can be seen, that conveys force. That conveys that someone should submit to this officer. There was also a traffic stop of a sedan that Mr. Bugg was was watching. There were blue lights flashing. There were at least three officers in the area. And let me ask this. Yes sir. You're starting after a lot of activity has occurred. You're starting your argument after a lot of activity has occurred. I mean this is a, I don't know if you would agree or not, but it seems to be an odd situation where somebody gets in one car and gets another car and they drive around and then they come back. That is just, to me, extremely unusual. Now wouldn't that justify the officers in being a little unsettled about what's going on? You know, when you see these cars leave and come back and make them apprehensive about who it is and what it is they're dealing with. Well, yes Judge. And there was other information that they made the officers apprehensive about this suspected fugitive Darrell Brown, who appeared to be the driver of the SUV. Who was considered dangerous, armed? That was that was the information available to the officers. Admittedly, the driver wasn't him, but that's who they thought it was. That's correct. You don't contest that. That's correct. And so the driver of the SUV gets out of the SUV, gets into the back seat of the sedan. The sedan drives down the road, pulls into a parking lot, turns around. And your man, Bug, stayed in the car. Right. He stayed in it. That's a little odd situation too. Well, Your Honor. He stayed in the car where it parked on the side of the road. And that's something that the police said, you know, what he did was suspicious. I'm not sure what he could have done that wouldn't have been, that the police wouldn't have viewed it as suspicious at that time. He stays in the SUV when the police officers execute a traffic stop of the sedan. Mr. Bug gets out of the SUV and stands and watches. Well, that was suspicious as well because he concealed himself, partially concealed himself, by the vehicle after he got out. Well, the officers said... He could only see one officer across the road involved in that traffic stop, right? I think officer, well, Lieutenant Carroll and Sergeant Stevens saw Mr. Bug get out of the, get out of the car. And they could see him standing next to the SUV. He didn't see them. They didn't know... I don't think he testified, so we don't know if he... They didn't know he was in the SUV until he got out, correct? That's correct. He was more concealed had he stayed in the SUV. That's correct. And so he gets out of the SUV and he's watching this traffic stop. He's not doing anything. He doesn't flee. He doesn't walk away. He's watching a concealed position. Well, Your Honor, I... And at that time, he can only see one officer. And his friend, obviously, who had been the driver of the car he'd been sitting in, was across the street in that vehicle that was being stopped by the police. Your Honor, I think that the district court did not... Officers testified that Mr. Bug was undercover or positioning himself next to the SUV in a way to protect himself and hide. The district court did not make that finding. And I argued in my brief that it's... When you get out of the passenger side door, it's sort of natural to stand next to the passenger side, right? That was what the evidence said. Right. Your Honor, I think Mr. Bug's actions were probably the least suspicious thing that he could have done in that situation if he had fled or walked away. That would have, you know, he would have been evading the police. He just stood there and watched. He didn't approach the police. Had he stayed in the car, in the SUV, you know, concealed, as Judge Thacker mentioned, that may have been even more suspicious or stranger. But Officer Carroll and Mr. Bug, and the government has argued that this was a citizen encounter, and I wouldn't disagree that they had an interest in talking to him. Where I disagree is that they had reasonable suspicion to seize him at that point. It's not unreasonable for the officers to approach him in a citizen encounter, but when you approach someone, when an officer approaches someone carrying a shotgun and says, stop, I need to ask you some questions, he's conveying a sufficient show of force that that person wouldn't feel free to say, you know, I'm gonna go about my way. Now, the second part of a seizure is whether the person yields. And in this case, the district court found that Mr. Bug, you know, turned and reached towards his waistband. And Lieutenant Carroll further explains after he did this, he turns right back around to face Lieutenant Carroll. He doesn't have anything in his hands. He doesn't try and walk away. He doesn't turn around and flee. He doesn't put his hands in his pockets. He doesn't put his hands in his pants. I would submit that that is yielding to the officer's command to stop and answer questions. He doesn't, he doesn't leave the scene. I would submit that Mr. Bug, at that point, had yielded. So moving from there, the court finds that there actually was a seizure. You kind of backtrack and say, all right, what did the officers know at the time that they seized Mr. Bug? Was there reasonable suspicion that he was engaged in some sort of criminal conduct, as opposed to that this suspected fugitive was engaged in criminal conduct? And, Your Honors, I would point the court to a recent decision from this court from this year, United States v. Black. And in that case, some officers approached a group of men. It's about 10 o'clock at night in a high-crime area, about the same situation as here in Mr. Bug's case. And one of these, one of the men who was standing in this group, had a prior arrest record. Sort of similar to this suspected fugitive. One of the men was was openly, and as it turned out to be, lawfully armed. The officers could see that this person was, had a gun on his on his hip. What this court said was that the prior arrest record of one person does not impute some sort of criminal activity to another person. And the possession of a firearm by one person doesn't necessarily mean that there, that another person would possess a firearm, too. The court dismissed this kind of rule of two that the police officers proposed. And so why I think that's significant is that the information, the officers simply didn't have any information about Mr. Bug. They didn't even know he was, he was there until he gets out of the car. The information they had was all about this suspected fugitive. And what they knew about this suspected fugitive should not impute a criminal purpose to Mr. Bug. And whether this fugitive may have been armed should not be imputed to Mr. Bug as well. Now another fact that I think the contributed to the reasonable suspicion was that this, this SUV, as it approached the officers when they're on their stakeout, the SUV did a u-turn and, and went off in the other direction. I think the district court found that this was an evasive maneuver. Now I would submit that this sort of evasive maneuver by, by the driver of a car should not again be imputed to the passenger of the car. And there's some, I think some facts in this case that, that would separate Mr. Bug from this sort of evasive behavior. When the officers located the SUV, it was parked on the side of the road, the officers saw the driver get out and get into the sedan. The sedan drives down the road, does another kind of turn, another sort of strange or evasive move, and comes back in the same direction. So it seems that this sort of evasive conduct is actually following the driver as opposed to the SUV, which I think the government tries to claim that the SUV was engaged in evasive conduct. No, it was the driver that was engaged in evasive conduct. But then look at Mr. Bug's actions. He gets out of the car, he's standing there, he's not evading, he's not trying to get away, he's not doing anything evasive. He's there for the officers to see. Now, if the court gets to the point that this, and determines that the seizure occurred at a later time than the district court found, then the court will consider whether Mr. Bug's turning and reaching towards his waistband, whether that is, whether that adds to the mix for reasonable suspicion. And at what point in time did the district court find that Mr. Bug was seized? Your Honor, the district court found that he was seized when Lieutenant Carroll told him to stop and answer some questions. So immediately before Mr. Bug turned and reached towards his waistband. Now, if this court disagrees with the district court's finding, then all of the events subsequent to Lieutenant Carroll telling Mr. Bug to stop to answer questions, I think this court could consider it in the mix of reasonable suspicion. And the main additional factor would be that turn and that reach towards the waistband. But I would submit that even if the court were to consider that, that that's not enough to push the events to a reasonable suspicion standard. And I would suggest that the court look at some other cases where defendants have reached towards their pockets or done something with their pockets where the officers thought that the defendant possessed a firearm. Mayo is United States versus Mayo from this court is one where officers saw somebody walking in a high crime neighborhood at night and this this defendant, Mr. Mayo, had his hand jammed in his in his pocket and the officers thought well it looks like he either has something really heavy because there's his pocket is making it sagging or there's this big weight where he has his or he really has his hand pushed into the pocket hard because he's trying to control some heavy some heavy object. And then in a United States versus Black which was a 2008 case, the officers approach Mr. Black on the street. He has one hand in his pocket. It's cupped. They ask him to take his hand out. He refuses to take his hand out for a while but then he eventually takes it out and when he removes his hand, the officers can see an object in his pocket and they describe as six to eight inches long. It's flat. It looks heavy. They say, you know, this looks like a gun and then he puts his hand right back in his in his pocket. Those cases are very different from the situation here. The officers testified that they did not see a bulge in Mr. Bug's pocket. There's no indication that he had a firearm on him and his his actions, his actual movements were different than the defendants in these other cases. They say, I think the officers testified that that he reached towards his waistband or he reached towards his pocket but he doesn't actually put his hands in his pocket. In their description, it's it's sort of hard to tell exactly what Mr. Bug was doing. Lieutenant Carroll says that he, after he initially turned and reached towards his pocket, he made motions towards his pockets and towards his waistband but this sort of nondescript description of what the officers said they saw Mr. Bug do, I would submit just it doesn't rise to the level of some of these other cases where the court has found a reasonable suspicion that a person was armed. Yeah, I see that my time is almost up. Did you represent him in the district court? No, Your Thank you, Mr. Poppe. Let me hear from the government. May it please the court, Kartik Padmanabhan on behalf of the Appellee of the United States. The United States respectfully requests that this court affirm the district court's decision to deny Mr. Bug's motion to suppress evidence. The officer's actions on the night of December 11th, or excuse me, December 17th, 2011 were not only justified but necessary both for their safety and the safety for the public at large. And I think the district court got it exactly right in finding that there was a seizure and there was reasonable suspicion to believe criminal activity was present. And opposing counsel discussed Mayo and I think the Mayo decision actually supports the government. One thing I would add is that Mayo actually happened in the middle of the day and the court still found that there was reasonable suspicion and the factors the court found in Mayo, that this court found in Mayo, are the same factors that are found in Mr. Bug's case. Namely that there was suspicious activity. There was what? There was suspicious activity on behalf of Mr. Bug. There was an evasive... What was the suspicious activity particular to Mr. Bug at the time he was seized? When he got out of the car, the black SUV, he got out of the car, he was in a covered position, he was looking at... What was the covered position? Standing next to the vehicle? Well I think it's important to know he was he was next to the SUV, yes your honor, but he was behind the engine block. So if he had a weapon he could have fired at Officer Bourgeois who was addressing the white sedan and had no idea there was another individual behind him. The only people that knew that Mr. Bug was there was Lieutenant Carroll and Sergeant Stevens. So Officer Bourgeois could have been ambushed. They didn't know he was there before he got out of the SUV, right? That's correct, your honor. So he revealed himself to the officers rather than stood next to the closed passenger door, right? He didn't know they were there though, did he? Exactly, your honor. He didn't know they were there. As officers, as Lieutenant Carroll and Sergeant Stevens testified, he had no idea until they started approaching him and then when Lieutenant... The officers testified as to what Mr. Bug knew? No, your honor. Lieutenant Carroll testified that when he approached Mr. Bug, he was intently looking at what was happening with the white sedan and only when he started speaking to Mr. Bug did he turn in a surprised manner and face Lieutenant Carroll was talking to him. So getting out of the vehicle, that was reasonable suspicion? Well, I think the officers testified there was suspicious behavior in the sense that they've both been on the force. I think Lieutenant Carroll has been on the task force for four years, Sergeant Stevens for 13 years. They've encountered numerous traffic stops. Sergeant Stevens said maybe over a thousand traffic stops and they know what a routine bystander looking at a traffic stop looks like and they said this was something much more than that. That based on their experience, which this court gives credit to because they see what happens on the street on a daily basis, that this was much more than just a routine bystander looking at a traffic stop. They determined that the way he was looking at the white sedan was suspicious and they had a fear for Officer Bourgeois' safety that he could be ambushed and they had no idea there was anyone behind him. So he got out of the vehicle and he looked at the traffic stop. That was the reasonable suspicion? No, your honor. That was one factor. That was at that point. But as this court has discussed, Mr. Bugg was also in the car that with the suspected fugitive that when they noticed the initial police presence, the unmistakable police presence and that there were a number of marked police cruisers, it suddenly stopped, made a U-turn and sped away. That was the first factor the district court found. The second factor the district court found was when they found the SUV and the white sedan next to each other, it was in a high crime area and then the person matching the fugitive, as a driver's seat of the black SUV, got in the passenger seat of the white sedan, drove about 50 yards, made a U-turn and came right back to the same spot and stopped next to the black SUV. That's more suspicious. Absolutely, your honor. I mean, why would that possibly happen? And so I think that was that was an additional factor that the district court found added to the reasonable suspicion of the officers. And then add to that the, I guess, unnatural attention that Bugg was paying to the traffic stop. Based on those factors together, the court found a reasonable suspicion of criminal activity. It's only after all that that they stopped and told him to stop. Yes, your honor. And I think it's important... Don't challenge what Judge Wilson found in that regard when the seizure occurred. No, your honor. I agree with the... Except that. Yes, your honor. And I agree that the seizure occurred when... But it was a sound seizure as far as you're concerned. Yes, it was. Absolutely, your honor. Let me ask you this. Let's suppose all this activities occurred. The white sedan has come back. Bugg's sitting in the car thinking, what can I do? And you're his lawyer. You're sitting next to him. And he turns to you and says, what can I do to keep from being stopped and searched? I'm sitting in the car. Now, what would you advise him to do? What could he have done to avoid being stopped and searched? Well, at that point, I'm not sure that he could have done anything at that point. Because you have to keep in mind that all this activity is already transpired that he was a part of. No matter what he did, he was going to get... There was reasonable suspicion to stop him and search him. No, your honor. I think the key is after he got out of the car... No, no. He's asking you. He's sitting in the car. He's not gotten out of the car. Nobody knows he's there. And he looks at you and he says, what can I do to keep these officers from stopping me and searching me? What could he do? Well, if he got out of the car and I think his officer testified he was just routinely watching the, you know, traffic incident like you or I would, just in a casual type manner, that might have not given suspicion to the officers that he was engaging in some sort of suspicious activity. I mean, honestly, if he had never gotten out of the car, the officers would have never known he was there. Because they only knew he was there when he opened the passenger side door. But I think... They would have known he was there. If he had found he was there. If he had stayed in the car, he'd been searched. He could have been, your honor. Yes, I mean... If he had been sitting in the backseat, you're his lawyer, and you probably would have told him, you better stay where you are. But he probably still would have been removed from the car and frisked. Yes, your honor, and I think that's entirely appropriate. So there was enough reasonable suspicion as to him by being a passenger in that SUV that there was nothing he can do. It didn't matter if he got out of the car or not. No, your honor. I think the district court was right in that they assessed Bugg's individualized actions and that when he got out of the car, that was another factor in assessing the reasonable suspicion standard. And I think all those factors together caused the district court to find reasonable suspicion. I think, as the district court found, if you take any one of those factors in isolation, or maybe even two factors... But if he'd stayed in the car, you would still argue there was enough reasonable suspicion? I think there could have been, your honor. And I think this court's decision, recent decision, in the United States v. George is instructive in that sense. What's that case? United States v. George. I think it was decided December 16th of this year, or excuse me, October 16th of this year. And in that case, very similar to this, there was a, I mean, there was a car chase between two cars, not police cruisers, just two cars racing down the road. One of the cars ran a red light. The officer stopped his car. The defendant, Mr. George, was a passenger in that car, and they decided to ask him to step out. And when the stop occurred in a high-crime area, admittedly it was a little later than that, it was 3.30 a.m., but the circumstances of the stop, the court found that the circumstances of the stop, in the driver giving conflicting events of what happened, justified, was one of the reasons that justified a search and seizure of the defendant, who was a passenger in that same car. He wasn't driving. He didn't commit any of the traffic violations, similar to this, but he was still part of the circumstances that led to that stop. And so, and he exhibited nervous behavior, as did Mr. Bugg in this case. And movement... What was Mr. Bugg's nervous behavior? Well, I think when he got out of the car, and Lieutenant Carroll approached him, he first gave unintelligible responses, backed away, and that's when... Because two officers were approaching him, one with a shotgun, late at night, and so he, what he said was, I didn't do anything, right? Well, he said I didn't do anything, or what are you stopping me for? And he gave, I guess he mumbled something that was somewhat unintelligible to the officers, but he started backing away a couple steps as well. Unintelligible doesn't equate to nervous behavior, does it? Well, I think the nervousness, I think, is routine for, you know, any bystander to engage, to be somewhat nervous when stopped by officers. Right. And I think, but I think the point is that the nervousness alone, if that was all there was, wouldn't lead to a reasonable suspicion of criminal activity finding, but I think it's that behavior combined with the other factors that were present in this case. As the court has recognized, the activities that happened on this night were very unusual in terms of, from the very beginning, from when the fugitive, or the car that had the suspected fugitive initially encountered the police presence, sped away to the the U-turn of the white sedan, you know, several, several minutes later. So I think the combination of circumstances leads to the finding of a reasonable suspicion of criminal activity, and I think defense counsel, or appellant's counsel, has kind of parsed through each factor that the court found in saying that this factor isn't sufficient, and, you know, factor two isn't sufficient, but this court has found on numerous occasions that you can't, you can't do a piecemeal analysis of it, you have to take the factors together in finding or addressing reasonable suspicion. But we can only take the factors up to the point they seized him. We've got to look at it up to that point. What happened after that point, we can't take into account. Do you agree with that? Well, your honor, I would say that the seizure... We can't take into account that he put his hands up and they found a gun on him. No, your honor, I would say that... Well, I think that lawfully flowed after the seizure happened, but I think... That might be admissible against him, but I'm on the question of whether he was properly seized or not. Well, I think that the judge Wilson was right in determining the seizure occurred when officer, or lieutenant Carroll said stop, but I think the... You said you accept that. I accept that, but I think the alternative... So did this nervous response happen after he said stop? No, it happened before, but I would say... So the nervous response on the record here, I think they said he was nervous after he was told to stop, put his hands up. Well, no, after he was told to stop is when he made the movement, he turned and he... But the officer said he was very nervous. Right. When they told him to stop and put his hands up, he seemed very nervous. Well, I think the... I thought that's when the word nervous got into this record. Well, I think the nervousness kind of continued, but I think the court can consider the furtive movement towards his waistband and reaching for a gun. I think the district court... That was well after. That was after he was seized. Yes, your honor, and I think the point is... We can't take that into account, can we? I think you can. I think the district, this court... We can take into account what happened afterwards. Well, I think there's an alternate theory, your honor. I think the district... Well, you're arguing you're right for a second. You fall back theory, but that's not the one Judge Wilson relied on. Yes, your honor. That's correct. Then we should take into account that that wasn't a fugitive at all, and he wasn't, so he wasn't who they were looking for if we're going to take into account everything that happened after. Well, your honor, the officers at the time reasonably thought that the driver of the I mean, so he thought he was a fugitive, and I think this court, and my point is that Judge Wilson was right. He identified the point at which the seizure happened, but if this court, for some reason, had a problem finding that there was a reasonable suspicion at the point where Judge Wilson found the seizure, it's the government's position that you can consider his movement towards his waistband as well. I was thinking United States v. Smith... I think it upholds you on another theory. Right, exactly, your honor. I think... Right. Yeah, United States v. Smith, this court said that this court can affirm on any ground that's apparent from the record, and so in that sense, if this court found a problem with the seizure at that point, it could find that he was seized only after he made a movement to his waistband. You don't want us to go there. I don't think it's necessary for the court to go there, and I think that's why Judge Wilson didn't go there, because he thought the seizure happened before, there was reasonable suspicion at that point, so there's no reason to go to the next step and address deferred movement towards his waistband. And it's worth noting that the gun was actually found at his waist, so the officer's suspicion in thinking that he might have been And then after that point, you know, he exposed the firearm at his waist on his own. When Sergeant Garrett asked him for identification, he reached back, he exposed the firearm on his own, and then made the excited utterance, I was just released from prison on a felony drug charge, and that's when they placed him under arrest. And then he gave him Randi's confession, it's the crack cocaine that was found on him, the firearm was his. So all that legally flowed from the lawful seizure. Whether this court finds it happened when a moment later when he made the movement towards his gun. And I think if the court was to find that the seizure happened moments later when he made the movement towards the gun, that's when the lender analysis would be appropriate in the sense that, like in lender, he wouldn't have submitted to officer or to Lieutenant Carroll's command to stop. He wouldn't have submitted, and that's why he made the movement to his gun, and that's when he was seized, and then so that that would be one additional factor the court could consider in finding reasonable suspicion that criminal activity was present. And I think this, and I think the court, and I think one argument that defense counsel made or was that the factors in, you know, mayo and black didn't support a finding of reasonable suspicion in this case. And as I said, I think those factors are a lot more significant, and they haven't, they did happen late at night, and I think the key is the officers were just concerned about officer safety. What more that could the officers have done? Wait to see what Mr. Bug does? When does late at night start? This was 10 p.m., that's late at night? Well, I think it could be in the sense that it was dark. It was December, so it wasn't like, you know, eight o'clock in April where it'd still be light out, there's clear visibility. So it's 6 p.m. in December, it could be late at night because it's dark. Well, I think it's a factualized determination based on all the factors. Late at night, I think 10 o'clock, a lot of people would consider somewhat late at night. It's not the same as 3.30 in the morning, obviously, but I think late at night is just one factor in addition to all these other factors. And the lateness, actually, of the hour was not even a factor that Judge Wilson considered in making his finding of reasonable suspicion. He considers the high crime area, the suspicious activities taken by the SUV that Mr. Bug was a passenger in, the suspicious activity of the suspected fugitive in getting into the white car and coming back around, and then Mr. Bug's unnatural preoccupation with the traffic stop. Those were the factors that Judge Wilson identified. And then I would submit if the court had a problem with just that limited set of factors, to also consider the movement towards the waste. And this all happened within moments. It's not like, you know, Lieutenant Carroll said stop, a few minutes transpired, and then he made his movement to his waste. This all happened within seconds of each other, such that it all was, you know, almost linked by time. So it was just seconds that all these commands happened. If there are no further questions, Your Honors, that's my brief. Thank you, Your Honors. Mr. Hoppe? The court asked, did Mr. Bug know that the police were there? I think Mr. Bug certainly knew that that Officer Bourgeois was there. He had activated his lights and pulled over the sedan. So certainly Mr. Bug recognized there's a police presence. I think that there's probably some evidence in the joint appendix that Mr. Bug did not know that the Lieutenant Carroll and Sergeant Stevens were there until Lieutenant Carroll approached him and told him to stop and answer some questions. Attorney for the government brings up a recent case, United States versus George, and in that case, I think the officers followed a car that had run a red light and was driving aggressively. It was right on the tail of another car, and that was a reason for pulling over the car and for being suspicious of the driver and also the passenger. That's what this court said. Now, when the officers approached the car in George, Mr. George, who was a passenger, I think he was in the back seat, he immediately held up his ID and was kind of turning his head. He had one hand, his right hand, sort of under his leg, and the officer thought that was, well, caused him some concern right from the get-go that, you know, maybe there was a weapon. The officer asked him to put his hands on the headrest of the car, I think four times before Mr. George finally did that. Then the officer asked him to get out of the car, and when Mr. George got out of the car, he dropped his wallet and his cell phone, and he bent over to pick them up, and the officer took that as that Mr. George is either getting ready to flee or he was trying to reach for a weapon, and he seized him at that point. And this court said that all of these factors created reasonable suspicion, so that the officer could seize this passenger of the car. I think that the situation in different. For one thing, the driver of the car of the SUV who had done this this evasive U-turn got into a sedan, and then that sedan appeared to do some more evasive maneuvers, whereas Mr. Bug just gets out of the car in a known police presence, gets out of the SUV in a known police presence, and watches. He doesn't try to evade, and the whole concern, I think in Bug's case, is this evasive conduct. It's not necessarily the aggressive conduct of this car, so I don't think that the evasive conduct of the driver of the SUV can be imputed to Mr. Bug, whereas in George, the officers there really couldn't separate the aggressive driving of this car from from the passengers and the driver, because they're all still still in the car, and officers just didn't know what the situation was. I have just a couple minutes left. If the court has any other questions, I'd be happy to answer them. No, I think we understand your position. Thank you. All right, we'll come down to Greek Council, and then we'll take a break for about five to ten minutes.
judges: William B. Traxler Jr., Robert B. King, Stephanie D. Thacker